# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ANGELINA GLENN,

        Plaintiff,

vs.                                          Civ. No. 04-110 MV/WDS

AMERICA ONLINE, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant=s Motion for Summary Judgment, filed February 8, 2005, **[Doc. No. 26]**.  The Court, having considered the motion, response, reply, relevant law, and being otherwise fully informed, finds that the motion will be **GRANTED in part** and **DENIED in part**.

## FACTUAL BACKGROUND[1]

Defendant America Online, Inc., ("AOL") hired Plaintiff in July 2000 to serve as a Customer Care Consultant in the Member Saves queue. Plaintiff was responsible for handling calls from AOL members who wished to discontinue their membership.  Before beginning her employment at AOL, Plaintiff received a copy of AOL's "Attendance Guidelines."  This document states that "excessive absences will be subject to disciplinary action, up to and including termination."  Plaintiff also signed a letter welcoming her to employment with AOL which stated

---

[1] The following facts are either undisputed or, where disputed, construed in the light most favorable to Plaintiff.

that "[a] good attendance record is a job requirement for this position."

The purpose of the attendance policy is to ensure that there are enough consultants on the call center floor to handle the volume of calls from AOL members.  When an insufficient number of consultants is available, AOL members calling customer support have to wait on hold longer before getting assistance.

AOL provides consultants with paid time-off, which accrues bi-weekly.  The amount of paid time-off earned varies depending on how long a consultant has been employed at AOL. Consultants take all leave, including vacation time, sick leave, personal days, or bereavement leave, from this bank of time.  Consultants do not need prior approval to take leave but must call a designated phone line to inform AOL that they are taking time off.  Consultants can also use this line to find out how much leave they have available in their leave bank.

AOL supervisors have discretion to employ progressive discipline.  When progressive discipline is employed, the lowest level of discipline is a documented verbal warning.  The next level of discipline is a written warning.  When an employee is subjected to a documented verbal warning or a written warning, they receive a Corrective Counseling form, a copy of which is maintained in their personnel file.  The third level of discipline is a final written warning, after which an employee can be terminated for future policy violations.  A supervisor has discretion to determine when to escalate discipline from one level to the next.

## I. Plaintiff's Attendance

Plaintiff had a history of unexcused absences and tardies at AOL.  Plaintiff was late for

work without an excuse on April 26, 2001, and received a documented verbal warning.[2]  On

June 4, 2001, Plaintiff was late for work without an excuse and received another documented

verbal warning.  On June 15, 2001, Plaintiff received a written warning for an unexcused absence.


From June 2001 to February 2002, Plaintiff did not receive any correctives for attendance.

On March 12, 2002, Plaintiff received a documented verbal warning for three unauthorized

absences.[3]  While Plaintiff signed the corrective without indicating she disagreed with its content,

Plaintiff now asserts that she was on leave under the Family Medical Leave Act ("FMLA") and

should not have been disciplined for these absences.  Plaintiff, however, provides no evidence that

she was on FMLA leave and does not explain why she would not have been required to request

leave covered by the FMLA.

Following the March 12, 2002 corrective notice, Plaintiff accumulated six additional hours

of unauthorized absences for which she received another documented verbal warning on

May 1, 2002.[4]  On May 6 and 7, 2002, Plaintiff took twelve hours of leave time even though she

---

[2]  Plaintiff's testimony regarding this documented verbal warning is conflicting.  In her
deposition testimony, Plaintiff stated that it was her signature on the April 26, 2001 Corrective
Counseling form but that she could not remember signing it.  In her opposition to the instant
motion, Plaintiff submits an affidavit stating that it is not her signature on the document.   Plaintiff
does not dispute, however, the relevant part of this event--that she was late for work without an
excuse on April 26, 2001.  As a result, whether Plaintiff remembers signing the corrective or the
reason she was late is irrelevant

[3]  There are a number of inconsistencies in the documents submitted by AOL.  For
example, the March 12, 2002 documented verbal warning purports to discipline Plaintiff for an
unauthorized absence on March 13, 2002, the day *after* the form is dated and signed.

[4]  The May 1, 2002 corrective notice indicates that Plaintiff received a documented verbal
warning for negative attendance on April 7, 2002.  This documented verbal warning, however,
has not been provided to the Court or cited by Defendant.  Defendant did provide the Court with

had no time left in her leave bank.  As a result, Plaintiff received a final written warning on May 8,

2002, for an  "unbenefited absence," which indicated that the corrective action would result in a

reduction of 40% in Plaintiff's upcoming stock allocation.  After being placed on final warning

status in May 2002, Plaintiff took additional leave time in June and July 2002 even though she

allegedly had no time in her leave bank.  AOL then issued an Incentive Reduction of 50% in

Plaintiff=s upcoming stock allocation noting that "Angie was placed on a Final Warning for

Unbenefited Absence on May 8, 2002.  Since then she has had three more occurrences of

Unbenefited Absence, the most recent being July 30, 2002."[5]

## II.  Plaintiff's Supervision by Ryan Pratt

Consultants at AOL are organized into teams and supervised by coaches.   Coaches

monitor their members to determine if each team member is complying with AOL call policies.

When Plaintiff began working as a consultant at AOL, she signed an agreement acknowledging

that her calls would be monitored by supervisors.  There are several methods available to AOL

coaches to monitor consultant calls, including a device called a y-jack.  A y-jack allows coaches to

listen to calls so that they can give immediate feedback to the consultant.  It is within a coach's

discretion to decide what method to employ to monitor consultants.

Sometime in the spring of 2002, Plaintiff began working on Coach Ryan Pratt's team.

Plaintiff claims that while working on Pratt's team, Pratt discriminated against her by issuing

---

a copy of a May 2, 2002 written warning for being absent without approved leave for 8 hours on
May 2, 2002, but Defendant does not argue in its brief that this absence was a basis for her
termination.

[5] Plaintiff asserts that she was told that she received the Incentive Reduction because of a
Saves Quality Call violation and that she never saw any paperwork attributing the reduction to her
attendance.  Plaintiff does not dispute, however, that she incurred the unbenefited absences.

unjustified correctives, by denying her training, by criticizing her at team briefings, and by

listening to her calls via a y-jack.

**A.  Correctives**

In addition to the 2002 attendance correctives discussed above, Pratt issued Plaintiff

several correctives for violating AOL's Saves Quality Call policy.  The Saves Quality Call policy

requires consultants 1) to verify that the caller is the proper billing contact for a particular account

before disclosing any information from, or making any changes to, the account and 2) to explain

and repeat all changes that have been made to the account before completing a call.  On May 8,

2002, Pratt issued a memorandum to Plaintiff's file documenting three instances in which Plaintiff

allegedly violated AOL's Saves Quality Call policy.  The memo stated that if Plaintiff failed to

comply with the Saves Quality Call policy in the future, she would receive a documented verbal

warning.  Despite the fact that Plaintiff testified in her deposition that she recognized this

document and had signed it, Plaintiff now questions the authenticity of the document submitted by

AOL because "the action plan was never on this type of paper" and she does "not recall seeing

this document or signing it."  Plaintiff does not, however, deny that the incident occurred or that

an action plan to address her alleged violations of AOL's Saves Quality Call policy was prepared.

On July 2, 2002, Pratt issued a documented verbal counseling to Plaintiff for violating the Saves

Quality Call policy.  Plaintiff contends that Pratt threw this corrective action document away after

listening to the tape of the call and realizing that he was mistaken about the alleged violation.

On August 5, 2002, Pratt listened to one of Plaintiff's phone calls with a y-jack and then

issued Plaintiff a written warning for violating the Saves Quality Call policy.  While Plaintiff's

signature appears on the document without any indication that she disagreed with its content,

Plaintiff denies that she violated the policy and asserts that she was told that if she did not sign the written warning, she would be fired.

### B.  Crew Briefing Comment

According to Plaintiff, Pratt made a comment to her during a crew briefing that she needed to take more calls that week.  Plaintiff believes she was taking a sufficient number of calls and that Pratt made this comment to harass her.  While this comment was made during a briefing with several employees, Plaintiff testified that only one other employee overheard the comment.

### C.  Training

Pratt rejected Plaintiff's application to take part in a training class for consultants who were interested in becoming coaches.[6]  Consultants are not eligible to participate in a coach training class unless they meet certain performance standards, including standards related to idle time. "Idle time" is the amount of time each hour that a consultant is sitting idle rather than taking phone calls.  To be eligible for the class, consultants must have an idle time lower than six minutes.[7]  Pratt rejected Plaintiff=s application because her "idle time" was too high.  Plaintiff admits that her idle time was more than six minutes per hour but asserts that her idle time was too

---

[6] Defendant's Statement of Undisputed Facts states that "Consultants who participate in the coach training class are guaranteed a promotion."  The declaration that Defendant cites as support for this statement, however, states that "Consultants who take the coach training class are *not* guaranteed promotion at AOL." (emphasis added).  Given this discrepancy, the Court will rely on the declaration.

[7] Plaintiff denies several factual assertions without support.  For example, Plaintiff denies that consultants are only eligible to participate in the coach training classes if they meet certain performance standards because "Pratt admits during his deposition that he had covered shifts for coaches and was promoted."  Even if true, this assertion does not demonstrate that the requirements for taking the coach training class are other than what AOL asserts.  At most, it suggests that there is more than one way to become a coach.

high because she failed to log off AOL's computer system before a lunch break. After Pratt told

Plaintiff that she was not eligible for the coach training class, she did not pursue the matter further

and does not know who, if anyone, from her team was allowed to participate in coach training at

that time.

### D.  Correctives to Male Employees

Plaintiff asserts that Pratt caught a male consultant viewing pornographic material on AOL

computers during his shift but did not issue a corrective to this employee or discipline him for this

violation.

## III.  Plaintiff's Termination

On or about August 6, 2002, Plaintiff complained to Human Resources that Pratt was

harassing her and discriminating against her based on her gender. Plaintiff was advised to return

to her desk and wait for Audra Mitchell, the manager of Human Resources, to call her. Plaintiff

waited approximately four hours during which time she did not take any calls. Pratt observed that

Plaintiff was not taking calls and asked her to accompany him to Human Resources. Plaintiff

discussed her complaints with Mitchell and told Mitchell that she wanted to be transferred to

another team. Mitchell told Plaintiff that she would investigate Plaintiff's complaints and advised

Plaintiff that she did not have to return to work until she was notified that she had been reassigned

to a new coach. When Plaintiff failed to come to work the next day, AOL terminated Plaintiff for

taking leave when she had no leave in her leave bank. Despite the fact that AOL asserts that

Plaintiff did not have any time in her leave bank when she left work on August 6, 2002, the

termination report issued by AOL on August 7, 2002, indicates that Plaintiff had fourteen hours

of leave in her bank.[8]

Sometime later in the week--either August 9th or 10th--Plaintiff returned to work. Plaintiff was able to enter the building with her badge and was told by Human Resources that she was not terminated.  When Plaintiff went to talk to Pratt about her canceled AOL employee account, Pratt informed Plaintiff that she had been terminated.  Plaintiff returned to Human Resources and again was told that she was not terminated.  Because Mitchell has not available, Plaintiff was told to leave work for the day.

Plaintiff was awarded unemployment benefits from the New Mexico Department of Labor Unemployment Benefits Division beginning with the week ending August 17, 2002, based on AOL's representation that Plaintiff "was discharged but not for misconduct."

## IV.  Plaintiff's EEOC Charge

On August 12, 2002,  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  The charge stated:

> On or about May 15, 2002 I requested that I be transferred and was denied.  I requested the transfer because my male supervisor has a reputation of harassing women and forcing them into resigning.  On August 5, 2002 my supervisor continued with his harassment forcing me to take sick leave.  I again requested that I be transferred out of his unit and have not received any response.
>
> I was advised that termination documents were being processed against me.

---

[8]  In her response to Defendant's undisputed material facts, Plaintiff admits that she did not have any time in her leave bank on August 6, 2002 and that Mitchell told her to return to work on August 7, 2002.  These admissions are contrary to Plaintiff's assertions elsewhere in her brief and in her EEOC charge that she had fourteen hours of leave available in her leave bank when she was terminated and that she was told not to return to work until she had been reassigned.  Construing Plaintiff's inconsistent statements in her favor, the Court will assume that Plaintiff's admissions, which contradict significant aspects of her case, were a mistake.

> I believe that I am being harassed because of my sex (female) in order to obtain my resignation from the company which is a violation of Title VII of the Civil Rights Act of 1964.

Only the box marked "sex" was checked in the "Cause of Discrimination" section of the charge.  The parties dispute whether Plaintiff ever amended her EEOC charge but no amended charge has been provided to the Court.

Acknowledging that there may have been some confusion regarding whether Plaintiff was told she did not have to return to work pending reassignment to a new team, AOL offered Plaintiff her job back starting September 2, 2002.  This offer, however, was only relayed to the EEOC investigator who did not inform Plaintiff.  When Plaintiff did not return to work, AOL terminated her employment for "job abandonment."  AOL was subsequently told by the EEOC that its offer had not been relayed to Plaintiff.  AOL then reextended its invitation to Plaintiff to return to work starting September 20, 2002, on Pratt's team.  Plaintiff declined this offer.

After receiving a right-to-sue letter from the EEOC, Plaintiff filed a complaint against AOL alleging employment discrimination on the basis of gender (Count I) and retaliation (Count II) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981.[9]  AOL hereby seeks summary judgment on all of Plaintiff's claims.

## LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "secure the just, speedy and inexpensive determination of every action."  *Celotex*

---

[9]  While Plaintiff=s Complaint asserts that her claims are brought under both Title VII and ' 1981, the basis for Plaintiff=s ' 1981 claim is unclear.  Under Tenth Circuit law, ' 1981 does not apply to gender discrimination.  *See Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979) (§ 1981 does not apply to sex or religious discrimination).

*Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).   Under Rule 56(c),

summary judgment is appropriate when the court, viewing the record in the light most favorable

to the nonmoving party, determines that "there is no genuine dispute over a material fact and the

moving party is entitled to judgment as a matter of law." *Thrasher v. B & B Chem. Co., Inc.,* 2

F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support

the nonmoving party's case." *Celotex*, 477 U.S. at 325.   Once the movant meets this burden,

Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits,

or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"   *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'"   *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).

Although the material submitted by the parties in support of and in opposition to the

motion must be construed liberally in favor of the party opposing the motion, *Pittsburg & Midway

Coal Min. Co. v. Yazzie,* 909 F.2d 1387, 1427 (10th Cir. 1990), the burden on the moving party

may be discharged by demonstrating to the court that there is an absence of evidence to support

the nonmoving party's case, *Celotex,* 477 U.S. at 325.   In such a situation, the moving party is

entitled to judgment as a matter of law "because the nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has the burden of

proof."   *Celotex,* 477 U.S. at 322.

**<u>DISCUSSION</u>**

Plaintiff's Complaint asserts that 1) Pratt discriminated against her on the basis of gender and 2) AOL retaliated against her for complaining that Pratt was discriminating against her on the basis of her gender.  Defendant asserts that both of these claims fail on a number of grounds.

## I.  Disparate Treatment Because of Gender

The basis for Plaintiff's disparate treatment claim is difficult to discern.  In her deposition testimony, Plaintiff asserted that her disparate treatment claim was based solely on that fact that Pratt 1) issued her unjustified correctives; 2) listened to her customer calls through a y-jack; 3) commented on the number of calls she was taking from customers; and 4) refused to allow her to take the coach training class.  In her response, Plaintiff admits these acts are the sole basis for her gender discrimination claim but then, in the argument section of her response, Plaintiff appears to abandon all these bases for her disparate treatment claim and asserts that her disparate treatment claim is based on her dismissal and AOL's failure to grant her request to transfer to another team. In the Pre-Trial Order, Plaintiff asserts that her disparate treatment claim is based on the fact that "Pratt would scrutinize and criticize Plaintiff's performance while allowing Plaintiff's male coworkers to get making [sic] similar or more egregious mistakes and infractions."  In Plaintiff≈s recently filed Statement of the Case, Plaintiff claims that Pratt "singled her out for disciplinary action on the basis of her gender for violations of AOL's attendance policy and AOL's procedures for customer service calls."   The Court, in the interest of being thorough, will attempt to consider all of the various bases Plaintiff has asserted for her claims throughout this litigation.    **A.  Exhaustion**

As an initial matter, Defendant asserts that Plaintiff has failed to exhaust her administrative remedies for her disparate treatment claim.  Defendant argues that the gender discrimination claim

raised in the charge is based on different allegations than the gender discrimination claim raised in Plaintiff's Complaint.

Exhaustion of administrative remedies is a jurisdictional prerequisite to bringing suit under Title VII. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (a plaintiff must generally exhaust his or her administrative remedies prior to pursuing a Title VII claim in federal court); *Knopp v. Magaw*, 9 F.3d 1478, 1479 (10th Cir. 1993) (administrative exhaustion is a jurisdictional prerequisite to suit under Title VII). To exhaust administrative remedies, a Title VII plaintiff generally must present her claims to the EEOC as part of a timely filed EEOC charge. *See Simms*, 165 F.3d at 1326. The charge "shall be in writing and signed and shall be verified." 29 C.F.R. § 1601.9, and must, at a minimum, identify the parties and "describe generally the action or practices complained of . . .," *id.* § 1601.12(b).

A Title VII plaintiff must exhaust all claims; however, the Tenth Circuit has held that judicial consideration of claims "not expressly included in an EEOC charge is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made." *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1416 n. 7 (10th Cir. 1993) *overruled on other grounds by Davidson v. Am. Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003). For claims to be reasonably related, the EEOC charge and judicial complaint "must, at a minimum, describe the same conduct and implicate the same individuals." *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994).

Plaintiff's charge only generally alleges that her supervisor harassed her and that she requested a transfer due to this harassment. The harassment could be read to encompass the

12

correctives, the comment regarding her performance, and the over-supervision she now alleges violates Title VII≤s prohibitions against gender discrimination.  While it is unclear from the charge whether Plaintiff is alleging that the failure to transfer was a discriminatory act, the EEOC investigated whether the failure to transfer was a discriminatory act and AOL addressed this claim in its response to the EEOC.  Thus, the failure to transfer claim would, and in fact did, fall  within the scope of an EEOC investigation which would reasonably grow out of the charges actually made.

The question of whether the charge exhausted Plaintiff's termination claim presents a more difficult question.  Plaintiff made no suggestion in her charge that her termination was a result of gender-based discrimination.  She did however, raise the circumstances surrounding her termination in the context of her gender discrimination complaint and a reasonable investigation would reveal that Defendant asserts that her termination resulted from excessive documented absences, a record Plaintiff challenges as discriminatory.  Read very liberally, Plaintiff's EEOC charge exhausted her claim that she was terminated on the basis of gender.

Plaintiff, however, did not raise any allegations related to Pratt's denial of Plaintiff's attendance at a training class.  Plaintiff≤s charge does not mention this allegation; the EEOC apparently did not request information on this event; and AOL had no opportunity to respond to this allegation.  Plaintiff≤s allegations regarding the denial of a training opportunity is not sufficiently alike or reasonably related to the allegations in her charge to be considered exhausted.[10]

---

[10]  Defendant asserts that "[n]othing in the Plaintiff's EEOC Charge complains about the conduct of Ryan Pratt, which is now the subject of Plaintiff's complaint."  To the extent this statement contends that Plaintiff's EEOC charge did not complain about Pratt's conduct, it is

### B.  Standard for Disparate Treatment

Disparate treatment claims that are supported by indirect evidence of discrimination are examined under the familiar burden-shifting analysis first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under the burden-shifting method, the plaintiff first has the burden of establishing a *prima facie* case of disparate treatment.  *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff succeeds in showing such a *prima facie* case, a presumption of illegal discrimination is created and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged act.  *Id.*  If the defendant meets its burden by producing a "clear and reasonably specific" explanation for the conduct, *Burdine*, 450 U.S. at 258, the plaintiff may show that the reasons offered by the defendant were merely a "pretext" for discrimination, *McDonnell Douglas*, 411 U.S. at 804. Throughout the process of applying the *McDonnell Douglas* test, courts must remain flexible because the test "was never intended to be rigid, mechanized, or ritualistic."  *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

### C.  *Prima Facie* Case of Disparate Treatment

To establish a *prima facie* case of disparate treatment, a plaintiff must show that 1) she belongs to a protected class, 2) she suffered an adverse employment action, and 3) the defendant treated similarly situated employees differently.  *See Trujillo v. University of Colo. Health Science Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).  There is no dispute that Plaintiff, as a

---

without merit.  Plaintiff states in her charge that her supervisor is discriminating against her and while Plaintiff does not identify her supervisor by name, it is undisputed that Pratt was Plaintiff's supervisor during the time period complained about in Plaintiff's charge.

female, belongs to a protected class.

### 1.  Adverse Employment Action

#### a.  Corrective Notices

Plaintiff asserts that she was given unjustified correctives for violating AOL's Saves Quality Call policy and for unexcused absences.  As a general matter, an adverse employment action is one that results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  The Tenth Circuit liberally interprets the term "adverse employment action" and takes a case-by-case approach in determining whether a given employment action is "adverse."  *Jeffries v. Kansas*, 147 F.3d 1220, 1231-32 (10th Cir. 1998).  Written warnings qualify as adverse employment actions if they can have a direct effect on future employment opportunities.  *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (written warnings issued to employee were adverse employment actions for purposes of plaintiff's Title VII retaliation claim because under employer's policies, the more warnings an employee received, the more likely he or she was to be terminated for a further infraction).

Defendant argues that none of the written reprimands issued to Plaintiff for violating the Saves Quality Call policy constitutes an adverse employment action because Plaintiff was ultimately terminated on entirely separate grounds.  Regardless of the grounds on which Plaintiff was ultimately terminated, the correctives constitute adverse employment actions because, as a result of one of these correctives, Plaintiff's upcoming stock allocation was reduced.  *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1229 (10th Cir. 2000) (evidence that

15

supervisor disapproved substantial numbers of loans originated by the plaintiffs because they would not submit to his sexual advances thereby adversely affecting their eligibility for commissions and bonuses--is sufficient to demonstrate that the adverse employment action at issue here was significant, material, and tangible).  The reduction in Plaintiff's upcoming stock allocations tangibly and materially reduced the benefits of her employment and qualifies as an adverse employment action.[11]  For the same reason, at least some of the attendance correctives constitute adverse employment actions.  Furthermore, both types of correctives also qualify as adverse employment actions because the more warnings Plaintiff received, the more likely she was to be terminated for a further infraction.  *See, e.g., Roberts*, 149 F.3d at 1104.

### b.  Unnecessary Supervision

Next, Plaintiff complains that Pratt unnecessarily supervised her, including listening to her customer calls through a device known as a "y-jack."  A supervisor's routine monitoring of an employee does not generally rise to the level of an adverse employment action  *See, e.g., Martinez v. Henderson*, 252 F.Supp. 2d 1226, 1236 (10th Cir. 2002) (supervisor's observation of plaintiff performing his job did not rise to the level of an adverse employment action); *Freeman v. State of Kansas*, 128 F.Supp. 2d 1311, 1320 (D. Kan 2001) (a supervisor checking on an employee is insufficient to establish a Title VII violation); *Heno v. Spring/United Management Co*., 208 F.3d 847, 857 (10th Cir. 2000) (moving plaintiff's desk, monitoring her calls, being "chilly" towards her, and suggesting that she might do better in a different department were not adverse

---

[11]  Several of the correctives also delayed Plaintiff's promotional eligibility date by one or more months.  The parties have offered no evidence on the significance of the promotional eligibility date, or the significance of the delay.  Without this information, the Court cannot evaluate whether these delays are adverse employment actions.

employment actions) .

Coaches at AOL were authorized to listen to consultants through a y-jack in order to give immediate feedback on the consultant's performance.  The fact that Plaintiff did not like to be monitored through a y-jack and the fact that there were less intrusive ways a coach could monitor a call does not convert this form of supervision into an adverse employment action.

### c.  Oral Comments Regarding Performance

Plaintiff asserts that Pratt once told her during a daily crew briefing that she needed to take more phone calls.  A comment by a supervisor, even if unjustified, does not rise to the level of an adverse employment action.  *See Freeman*, 128 F.Supp. 2d  at 1320 (a supervisor may yell and scold an employee without violating Title VII); *Sanchez v. Denver Public Schools*, 164 F.3d  527, 533 (10th Cir. 1998) ("Courts considering the issue have held that 'unsubstantiated oral reprimands' and 'unnecessary derogatory comments' . . . are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status.").  This alleged comment did not significantly affect Plaintiff's employment status and therefore does not constitute an adverse employment action remediable under Title VII.

### d.  Training Opportunities

Plaintiff claims that Pratt's refusal to allow her to take a training class is an adverse employment action.  As discussed above, this claim was not raised in Plaintiff's EEOC charge and is not properly before the Court.  Even if it had been properly raised and exhausted, denial of a training opportunity does not, by itself, constitute an adverse employment action.  *See Munoz v. Western Resources, Inc.*, 225 F.Supp. 2d 1265, 1271 (D. Kan. 2002).  A plaintiff must provide evidence that she suffered adverse employment actions as a result of the alleged denial of training.

*Id.* Plaintiff has presented no evidence that she suffered any adverse employment actions from the alleged denial of the opportunity to attend the training class. Furthermore, Plaintiff concedes that she was not qualified to attend the class at the time.

### d. Transfer

Plaintiff asserts that the failure to grant her request for a transfer was an adverse employment action. Whether a failure to grant a transfer is an adverse employment action must be viewed in the particular circumstances of each case. In *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997), the First Circuit held that an employer's refusal to grant an employee's requested transfer could be an adverse employment action in a Title VII retaliation claim where the employee presented evidence showing that similar transfers for hardship reasons were so customary that they were a "privilege" of employment. In an unpublished opinion, the Tenth Circuit adopted the First Circuit's position, stating "[c]onsistent with our 'case-by-case' approach to determining whether a given employment action is 'adverse,'" we agree with the First Circuit's rejection of an automatic rule that a refusal to transfer is outside the scope of an "adverse employment action." *Trujillo v. New Mexico Dept. of Corrections*, 182 F.3d 933 (10th Cir. 1999) (internal citations omitted) (unpublished opinion). Plaintiff, however, provides no evidence that transfers were so customary that they were a "privilege" of employment. Plaintiff merely suggests that a transfer would have removed her from Pratt's supervision. Assuming Plaintiff could prove that she was being subjected to a hostile working environment, a refusal to transfer could be an adverse employment action. However, as discussed below, Plaintiff has failed to muster sufficient evidence to show that she was being subjected to a hostile working environment. Accordingly, on the record before it, the Court is compelled to conclude that the refusal to transfer here was not

18

an adverse employment action.

### e.  Termination

As noted above, it appears that Plaintiff is no longer pursuing this claim; however, if Plaintiff was still contending that she was terminated because of her gender she would unquestionably satisfy the adverse employment action requirement for this claim.

### 2.  Similarly Situated Employees

None of Plaintiff's theories of differential treatment survive the third prong of the *prima facie* case, where Plaintiff must show that similarly situated male employees were treated in a different manner.  "To assert a claim of disparate treatment, the plaintiff must show that he was treated differently than other similarly situated employees who violated work rules of comparable seriousness."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  *Id.*  (citation omitted).

Plaintiff can only muster one example in support of her argument that a male consultant was treated differently.  Plaintiff makes the unsupported assertion that a male employee was caught viewing pornography on AOL computers during his shift, but was not disciplined.[12]  Even assuming this assertion is true and was properly supported, it is insufficient to establish disparate treatment.  First, the misconduct is not comparable.  In the context of discipline, the comparison need not be based on identical violations of identical work rules but the violations must be of "comparable seriousness."  *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1233 (10th

---

[12]  AOL, on the other hand, has come forward with evidence that this same male employee was repeatedly disciplined by Pratt for attendance issues as well as Saves Quality Call violations.

19

Cir. 2000). "A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Id*. The Court's role is to "prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Simms*, 165 F.3d at 1330 (quotations and citation omitted).

Courts are reluctant to draw comparisons between different types of behavior that arise in different contexts. *See Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 771 (10th Cir. 1994) (rejecting comparison between falsification of records and abuse of alcohol in the workplace as not similar misconduct). The Court has no basis to draw a comparison between the lack of discipline for a single incident of viewing pornography and the discipline for multiple attendance violations.

Second, even if such a comparison were valid, Plaintiff needed to demonstrate more than one incident of leniency toward a male employee who had engaged in conduct of a similar nature. *Id.* (*citing Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931-32 (7th Cir.1993)). Incomplete or arbitrary comparisons reveal nothing concerning discrimination. *Id*. More evidence than the mere fact that one other employee was not disciplined for at best arguably similar misconduct must be demonstrated to sustain a charge of intentional discrimination. *Id.*; *Bluebeard's Castle Hotel v. Government of the Virgin Islands, Department of Labor*, 786 F.2d 168, 172 (3rd Cir. 1986) (more evidence than the mere fact that a similarly situated employee of a different race was not discharged for arguably, at best, similar conduct must be demonstrated to sustain a charge of intentional discrimination).

In the absence of evidence regarding similarly situated male employees being treated differently, it is worth addressing two other arguments Plaintiff makes in support of her disparate treatment theories. Plaintiff first submits an affidavit from Debbie Petito, Pratt's former

supervisor at AOL, who states that while employed at AOL she had a meeting with all the consultants coached by Pratt, at which she determined, based on statements by others, that "Pratt was treating female employees in a negative way" and that "Ryan's behavior and attitude toward women, especially mature women, needed to be adjusted. Ryan was treating women as though they were stupid. Ryan would be very condescending and nasty toward women consultants."

Petito's statements are based on hearsay. The Court can consider only admissible evidence in ruling on a summary judgment motion. Federal Rule of Civil Procedure 56(e) mandates that evidence offered in opposition to a motion for summary judgment be "made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Hearsay testimony cannot be considered because "[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill." *Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995) (citations omitted). "[G]eneralized, unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment." *Stevens v. Barnard*, 512 F.2d 876, 879 (10th Cir. 1975).

Petito does not claim to have personally observed Pratt's supervision of Plaintiff or Pratt's supervision of his other male or female employees. Consequently, Petito's statements are not based on her personal knowledge of Pratt's conduct and may not be relied upon to defeat summary judgment.

Plaintiff next notes that another consultant, Susan Green, filed an EEOC charge against Pratt. Plaintiff, however, has not provided the Court with any information about the status or content of Ms. Green's claim. The fact that Ms. Green filed a charge does not establish that she

was harassed or discriminated against.  The existence of other complaints against Pratt is

insufficient to defeat summary judgment on Plaintiff's claim that Pratt discriminated against her.

A complaint only shows that another employee subjectively believed that discrimination occurred.

It does not establish that such discrimination did occur against that employee or, more

significantly, against Plaintiff.  *See, e.g., Aramburu*, 112 F.3d at 1408 n.7 (subjective belief of

discrimination is insufficient to preclude summary judgment)

     Plaintiff simply offers insufficient evidence to support a *prima facie* case of disparate

treatment on the basis of gender.

## II.  Retaliation Claim

     Title VII makes it unlawful to retaliate against any employee because she has "opposed" any

practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  Plaintiff contends that, in

retaliation for complaining to AOL of harassment and discrimination based on gender--a practice

made unlawful by Title VII, she was terminated.

### A.  Exhaustion

Defendant again first argues that Plaintiff has failed to exhaust this claim.  Defendant asserts that Plaintiff's failure to check the box for retaliation on her charge prohibits Plaintiff from pursuing a retaliation claim in court.  Defendant overstates the significance of Plaintiff's omission. Plaintiff's failure to check the retaliation box on her EEOC charge is not dispositive; it merely creates "a presumption that she was not asserting claims represented by boxes not checked." *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 (10th Cir. 1998).  In this case, that presumption is soundly rebutted by the text of Plaintiff's charge.  In the text of the charge, Plaintiff states that she complained about harassment by her supervisor and requested a transfer. In the next sentence, she states "I was advised that termination documents were being processed against me."  Any reasonable investigation of Plaintiff's charge would have included whether the termination she discusses was in retaliation for her complaints of discrimination and harassment. In fact, the EEOC, in response to Plaintiff's charge, investigated a retaliation claim and AOL's response to the EEOC addressed the retaliation claim.  Under these circumstances, Plaintiff's failure to check the retaliation box does not preclude her retaliation claim.

Defendant also asserts that Plaintiff cannot pursue in court any alleged acts of retaliation that took place after she filed her charge with the EEOC because she did not amend her charge to include any subsequent acts.  The Tenth Circuit, relying on *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002), has held that each discrete retaliatory action constitutes its own "unlawful employment practice for which administrative remedies must be exhausted."  *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003).  Plaintiff, in her

deposition, testified that she never amended her charge.[13]   Thus, Plaintiff is barred from pursuing

any retaliatory actions that occurred subsequent to the filing of her EEOC charge on August 12,

2002.  This determination is not dispositive of Plaintiff's retaliation claim, which includes the

allegation that her August 7, 2002 termination was in retaliation for complaining to AOL that

Pratt was discriminating against and harassing her.

### B.  Standard for Proving Retaliation

#### 1.  *Prima Facie* **Case of Retaliation**

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show that: (1)

she engaged in protected opposition to discrimination; (2) Defendant subjected her to an adverse

employment action subsequent to the protected activity; and (3) a causal connection exists

between the protected activity and the adverse employment action.  *See Pastran v. K-Mart Corp.*,

210 F.3d 1201, 1205 (10th Cir. 2000). A meritorious retaliation claim will stand even if the

underlying discrimination claim fails.  *See Jeffries*, 147 F.3d at 1231.

Plaintiff easily meets the first two prongs of the *prima facie* case.  Plaintiff engaged in a

protected activity when she complained to Mitchell of Pratt's discrimination based on gender.

AOL terminated Plaintiff from her job the next day.  Termination is indisputably an adverse

action.  *See Burlington*, 524 U.S. at 761 (an adverse employment action constitutes "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

---

[13]   In support of her opposition to the instant motion, Plaintiff submitted an affidavit
stating that she did amend her EEOC charge.  Plaintiff does not provide any information regarding
the contents of the alleged amendment and the alleged amendment has not been provided to the
Court.  In the absence of any supporting documentation, Plaintiff's unsupported assertions that
contradict her earlier sworn testimony are insufficient to establish that an amendment occurred or
to create a disputed issue of material fact.

significantly different responsibilities, or a decision causing a significant change in benefits").

Plaintiff has also brought forth sufficient evidence to support a finding of a causal connection between the protected activity and the adverse employment action. The Tenth Circuit has repeatedly held that an inference of retaliation can be based solely on the close temporal proximity between some protected activity and an adverse action. *See, e.g., O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) ("[a] causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.") (internal quotes omitted); *McGarry v. Board of County Com'rs of County of Pitkin*, 175 F.3d 1193, 1201 (10th Cir. 1999) ("The requisite causal connection may be shown by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.") (internal quotes omitted); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (noting that "[t]he date of Plaintiff's termination is key to this inquiry because the closer it occurred to the protected activity, the more likely it will support a showing of causation"); *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (holding that one and one-half month period between protected activity and adverse action may, by itself, establish causation). In this case, the short period of time between the protected activity and the adverse action--one day--is sufficient to infer a causal connection between the two. Thus, Plaintiff has presented sufficient evidence for a *prima facie* case of retaliation and the burden now shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.

### C.    Legitimate Non-Discriminatory Reason for Adverse Action

With Plaintiff having presented sufficient facts to support a finding that she meets her *prima facie* case, the burden shifts to Defendant to produce a "clear and reasonably specific" explanation for its conduct.  Defendant asserts that Plaintiff was disciplined and ultimately terminated because of excessive absenteeism.  Defendant's reliance on the multiple reports of Plaintiff's tardyism and absenteeism suffices as a clear and specific explanation for the adverse employment action.

### D.    Evidence that Reason is Pretext

Once the employer meets its burden of production by coming forward with a nondiscriminatory reason for the adverse action against the plaintiff, the plaintiff must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief."  *See, e.g.*, *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir. 1995).  Pretext can be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)) (further citation omitted).  Of course, "[m]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."  *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988).

In this case, Plaintiff has come forward with evidence that on August 6, 2002, Plaintiff complained to Mitchell of Pratt's discriminatory actions.  Mitchell told Plaintiff that she did not have to return to work until she was notified that she had been reassigned to a new supervisor.

26

When Plaintiff failed to come to work the next day, AOL terminated Plaintiff for taking leave

when she had no leave in her leave bank.  Not only had Mitchell told Plaintiff not to come to work

but the termination worksheet prepared by AOL stated that at the time Plaintiff was terminated,

she still had fourteen hours of leave in her bank.  These inconsistencies and contradictions, taken

together, permit an inference that Plaintiff's termination was in retaliation for her complaint of

harassment and discrimination the prior day.

### III.  Hostile Work Environment Claim

Plaintiff also appears to be asserting a hostile work environment claim.  Title VII prohibits

an employer from "discriminat[ing] against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. §  2000e-

2(a)(1).  To establish the existence of a hostile work environment actionable under Title VII, a

plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the

discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of

her employment and created an abusive working environment. *Chavez v. Thomas & Betts Corp*.,

396 F.3d 1088, 1096 (10th Cir. 2005).

Not all harassment creates a hostile work environment; the harassment must be "sufficiently

severe or pervasive to alter the conditions of [the victim's] employment."  *Meritor Savings Bank,*

*FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399 (1986) (internal quotation marks omitted).

Severity and pervasiveness are evaluated according to the totality of the circumstances,  *Harris v.*

*Forklift Sys., Inc*., 510 U.S. 17, 23, 114 S.Ct. 367 (1993), considering such factors as "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999), *quoting Harris*, 510 U.S. at 23, 114 S.Ct. 367.

But severity and pervasiveness are not enough.  The "plaintiff must produce evidence that she was the object of harassment because of her gender." *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998).  Title VII targets discrimination. Thus, a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment, in this case, based on gender.  "'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.'" *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) (*quoting Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994)).  Normal job stress does not constitute a hostile or abusive work environment.  *See Trujillo,* 157 F.3d at 1214 ("The hostile work environment that Plaintiff portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world.  Normal job stress does not constitute a hostile or abusive work environment.").  The Court "cannot vilify every supervisor that implements a policy with which an employee disagrees or that monitors [the] employee's conduct." *Id.*

Plaintiff has not produced any evidence that any of the actions of which she complains were motivated by bias against her on the grounds of her gender or that they rose even close to the level required for a hostile work environment claim.  The facts, as alleged, show nothing more than that Pratt closely supervised his team.  Close supervision of Plaintiff, without more, is insufficient for a rational jury to find that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Service*, 142 F.3d 1334, 1341 (10th Cir. 1998) (internal quotation marks and citations omitted).

Plaintiff has failed to state a *prima facie* case of hostile work environment and summary judgment will be granted in favor of Defendant on this claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant=s Motion for Summary Judgment, filed February 8, 2005, **[Doc. No. 26]** is **GRANTED in part** and **DENIED in part.** Summary judgment is hereby granted in favor of Defendant on Plaintiff=s disparate treatment claim and Plaintiff=s hostile work environment claim.

Dated this 3rd day of August, 2005.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
     Donald Sears, Esq.

Attorneys for Defendant:
     Charles R. Peifer, Esq.
     Lauren Keefe, Esq.